Judgment rendered April 9, 2025.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 56,133-CA
No. 56,134-CA
*(Consolidated Cases)*

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

SUCCESSION OF VALERIE BRYAN BRASWELL

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 632,226

Honorable Brady D. O'Callaghan, Judge

* * * * *

| | |
|---|---|
| THOMAS, SOILEAU, JACKSON & COLE, LLP<br>By: Steven E. Soileau | Counsel for Appellants, Kenneth Pardee and Debra Pardee |
| WEEMS, SCHIMPF, HAINES & MOORE, APLC<br>By: Kenneth P. Haines<br>    Kyle A. Moore | Counsel for Appellees, Julie Bryan White, Jennifer Bryan Clark, Suzanna Braswell Sharman and William Bryan |

* * * * *

Before COX, THOMPSON, and ELLENDER, JJ.

**THOMPSON, J.**

A chronically ill woman was accompanied by her caregiver to an attorney and executed, in quick succession, two separate wills. The scheme of having two wills was to give the false impression to the decedent's family that she was leaving the majority of her property to her sisters, when in reality, the first will was revoked and her caregiver was the primary beneficiary of the second will. The second will was kept secret from the decedent's family until after her death. The decedent's sisters probated the first will, and the caregiver subsequently probated the second will. The matters were eventually consolidated, and after a trial, the trial court determined that the decedent lacked the capacity to execute either will and that she had been unduly influenced by her caregiver. With both wills declared null, the decedent's daughter inherited her property through intestacy. The caregiver and her husband now appeal this judgment. For the following reasons, we affirm the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

Valerie Braswell ("Valerie") suffered from chronic health problems, including COPD and cervical stenosis, that left her virtually a quadriplegic. She was divorced and had one child, Suzanna Leigh Braswell ("Suzanna"), and two sisters, Julie Bryan White ("Julie") and Jennfier Bryan Clark ("Jennifer"). Due to her health condition, from 2017 through 2020, Valerie and her mother were both living in Heritage Manor Stratmore nursing facility in Shreveport, Louisiana. With the onset of Covid in 2020, Valerie's father, Bill Bryan ("Bill"), elected to move into a home that could accommodate Valerie and her mother, and they moved home.

Valerie's two sisters lived in Texas but would visit the home approximately once a month. Bill needed help caring for Valerie and her mother, so he hired Debra Pardee ("Debra") and Stephanie Barbo ("Stephanie") from the nursing home to be their caretakers. Debra and Stephanie worked alternating 12-hour shifts in Bill's home from 8 a.m. to 8 p.m., with Debra primarily caring for Valerie. Valerie's mother died in February of 2021.

On April 20, 2021, two months after her mother's death, Valerie was driven by Debra, and they left Bill's home to "run errands." They first went to a doctor's appointment for Valerie, where she met with the doctor and his nurse practitioner. Next, they stopped by Valerie's bank, where Valerie was taken inside, and Debra was added to her bank account. From the bank, they next went to the office of attorney Patricia Miramon ("Miramon"), who is primarily an estate planning attorney. Valerie and Debra had previously communicated with Miramon about executing a will for Valerie.

While at Miramon's office, Valerie told Miramon that her sisters hated her, and Bill was pressuring her to create a will in favor of her sisters. She wanted to show them a will to get them to stop pressuring her, while secretly intending for there to be a second will in favor of Debra that she was not going to show her family. She also told Miramon she did not have a good relationship with her daughter. Valerie executed the two wills in quick succession. In the first will, she bequeathed two pieces of furniture to her daughter, Suzanna, and left the remainder of her estate to her sisters as her universal legatees (the "first will"). Three minutes later, Valerie executed a second will that revoked the first will and bequeathed the same pieces of

2

furniture to Suzanna and the remainder of her estate to Debra (the "second will"). Valerie returned home and showed the first will to Bill, but she and Debra kept the existence of the second will a secret. Valerie died a few months later, on August 11, 2021.

On August 21, 2021, Valerie's sisters filed a petition for probate of the first will, with no mention of the undisclosed second will. An order making the first will executory was signed and filed on August 23, 2021 in docket number 632,226 in the First Judicial District Court. On September 2, 2021, Debra filed a petition for probate of statutory testament under a new docket number, docket number 632,443, also in the First Judicial District Court, and an order filing and executing the second will was signed on September 8, 2021. At that moment, there were competing wills and corresponding orders.

On October 22, 2021, Debra filed a rule to annul probate and rescind orders of appointment co-executors and independent executorship in the matter filed by Valerie's sisters. On February 7, 2022, the trial court granted the rule to annul, and the two separate matters were consolidated. Numerous motions were then filed by the parties, and the matter was set for trial to address the sisters' claims of undue influence exerted by Debra and Valerie's lack of testamentary capacity.

A bench trial began on July 27, 2023. The first witness to testify was nurse practitioner Laura Perkins ("Perkins"). She testified that she works at Willis-Knighton Medical Center at Internal Medical Center, where she is a nurse practitioner, and the court qualified her as an expert nurse practitioner. Perkins began seeing Valerie in 2017 at the Heritage Manor Stratmore

3

nursing facility. She testified that she remembers Valerie better than other patients because she was needy and liked to be seen by medical personnel. Valerie had severe COPD and was oxygen dependent. She testified that Valerie had sitters to help with activities of daily living, or ADLs, including bathing, personal hygiene, feeding, and cooking. Valerie could not drive, had very little control over her upper extremities, and had cervical spine disease that caused her a great deal of pain. She testified Valerie was almost quadriplegic and had depression and anxiety.

Perkins described Valerie's lack of what she considered "executive function," which she testified was the "ability to make decisions, complex decisions, ability to do things that take more than one step, the ability to act like an adult." She testified that people who lack executive function are more vulnerable to their environment. Perkins testified that she saw Valerie on the day she executed the wills and that she did not have the executive function to execute the wills. Perkins described that Valerie was so anxious on April 20, 2021, she needed her medication increased and that her weakness had dramatically increased. Perkins testified, "I don't think she could have made those kinds of decisions a year before, and certainly not that day I saw her." Perkins testified that she did remember Valerie's father visiting her in the nursing home but not her sisters. On cross-examination, Perkins testified that there was nothing in Valerie's chart about the loss of executive function.

Attorney Miramon testified that she sends potential clients information sheets to fill out before their first meeting and Valerie came in with her sheet filled out. Miramon testified:

4

> She told me that she was being pressured by her father and her sisters to do this will leaving everything to them and that she didn't want that. And that she had a bad relationship with her sisters. And that they hated her. They wanted her dead. They didn't want her to live with her dad. Her dad was putting a lot of pressure on her. And she had—she wanted me to do two separate wills.

Miramon acknowledged that Valerie could not write on her own, and someone else had handwritten in that Debra Pardee should inherit Valerie's estate. She testified that Valerie signed the first will at 4:35 p.m. and revoked it at 4:38 p.m. Miramon testified that she knew Valerie's intention was always to revoke the first will soon after signing it. She did not want her family to know about the revocation of the first will until after she died. After Valerie revoked the first will, she executed the second will, which leaves the hope chest and antique desk to Suzanna and all of her remaining property to Debra. If Debra is unable to receive the property, then the property would go to Debra's children, Crystal Todd Pryor, Jesse Quintana Todd, and Chase Duran Todd.

Miramon stated that when Valerie came to her office, she was in an electric wheelchair, but Miramon did not ask her about the specifics of her condition or medications. On the day they executed the wills, they also created and executed a new power of attorney for Valerie, naming Kenneth Pardee ("Kenneth"), Debra's husband, as the power of attorney with Debra as the alternative agent. Miramon noted that she does normally ask people who come to her for estate planning a series of basic questions about themselves to make sure they are lucid and can answer. Miramon testified that Valerie seemed lucid and capable, and she did not seek a doctor's note about her capacity.

Also testifying at trial was Dr. Robert Hernandez, an internal medicine doctor, who confirmed that he began treating Valerie in October of 2017. When Dr. Hernandez began treating Valerie at the nursing home, she had cervical myelopathy with weakness in her upper and lower extremities, severe COPD, was on oxygen, and had a history of anxiety and depression. Dr. Hernandez saw her once a month, and his nurse practitioner saw her more often on a regular basis. The COPD caused chronic respiratory failure. He testified that Valerie's anxiety medications can cause confusion, disinhibition, and problems with mental functioning and cognitive ability. Dr. Hernandez testified:

> Q: Now if Ms. Miramon had written you a letter and inquired as to provide a letter that Ms. Braswell was capable of executing a will in April of 2020, would you have written that letter?
>
> A: No.
>
> Q: Why not?
>
> A: I just didn't think she was capable of making those higher— higher ordered complex decisions.
>
> ***
>
> Q: So from your observations and treatment of her, knowing what her medical condition was and her medications that she was on, do you think that Ms. Braswell in March or April of 2021 was capable of formulating a plan like that [the two-will plan] on her own?
>
> A: No.

Dr. Hernandez also testified that Valerie could be easily influenced due to her lack of executive function and that Valerie never expressed that her sisters disliked her. He confirmed that he never witnessed anything negative between Valerie and her father, who was often with her during her appointments. Under cross-examination, he testified that Valerie had never

undergone any cognitive testing or ever been diagnosed with dementia or Alzheimer's.

Julie White, Valerie's sister, testified that they had a normal sister relationship and that she did not hate Valerie. Valerie never told her that she wanted to leave all of her property to Debra. Julie testified that she discussed with her father that he was going to give Debra $75,000 to add a handicapped room onto her house for Valerie after he passed away. Julie testified that all of her father's money was going to go to Valerie's care after he was dead and that there was never a plan for Valerie to go back into a nursing home. Julie stated that Debra drained Valerie's bank account before her death using her power of attorney.

Bill, Valerie's father, testified that Valerie was not capable of entering into contracts with other people. He testified that Valerie was dependent on her caregivers for her every need. He stated that he had no idea that Valerie was going to Miramon to create a will until she came home and showed him the first will. He did not know about the second will until after Valerie had died. On cross-examination, he testified that Valerie knew who and where she was and was cognizant of what was going on around her.

Crystal Pryor testified that she is Debra's daughter and that she heard Valerie say that her sisters did not like her. She testified she never saw her mother trying to unduly influence Valerie or take advantage of her. On cross-examination, she testified that she interacted with Valerie about ten times in total and did not know the extent of her medical problems.

Stephanie Barbo testified that she and Debra worked separate 12-hour shifts for Valerie and her mother, while she was alive. She testified that

7

Valerie told her that her sisters hated her and that she did not have a relationship with her daughter. She testified that she heard Valerie's father tell Valerie that she had to sell her home or go back into a nursing home. She and Debra have been friends since they were teenagers.

Kenneth Pardee, Debra's husband, testified that Valerie was very smart and wanted Debra to have everything of hers because her sisters were going to have plenty after their father's death. He testified that he did not know what was in the second will, even though he was the executor of the will. Testimony clearly shows that Kenneth did not understand the difference between a will and a power of attorney. He testified he never made any financial decisions for Valerie and did not authorize his wife to remove any money from Valerie's accounts. He did not authorize his wife to sign as Valerie's power of attorney on the sale of her house. He did not authorize the removal of $85,900 from Valerie's account by his wife.

Debra testified that Valerie told her that she wanted to create a will so that her father and sisters would stop threatening to put her back in a nursing home. She testified that she felt so badly for Valerie that she offered for Valerie to come live with her and her husband after her father died. She acknowledged that she drafted a $65,000 check out to herself from Valerie's account for improvements to her home. She testified that Valerie was fine on April 20, 2021, when she went to the doctor and to Miramon's office.

Debra alleged that she did not know about the two-will scheme. She believed Valerie had capacity and did not influence Valerie. She testified that Bill and Valerie told her what to write down on Miramon's questionnaire, including that Debra would inherit all her personal property.

8

She testified that Bill was aware that Valerie was going to Miramon's office. She stated that Valerie executed a power of attorney that granted her the right to act as power of attorney but admitted that she has never produced a copy of the power of attorney that grants her that authority. On cross-examination, Debra testified that Bill and Julie told her to withdraw the $85,900 from Valerie's account days before Valerie died because they wanted her to have the money.

Suzanna testified that she and her mother had a strained relationship, but they never went more than 10 years without speaking, as had been suggested by Debra. Suzanna testified that she went with her grandfather to see her mom in the nursing home when she lived with Bill in 2019. On cross-examination, Suzanna admitted to several criminal convictions and that she never visited her mother after Bill moved her into the home in 2020.

Debra challenged the standing of Julie and Jennifer to object to the second will. After reviewing the evidence and testimony, the trial court found that Julie and Jennifer had standing as the universal legatees of the first will to challenge the validity of the second will. The trial court's judgment then summarized the testimony and evidence presented at the trial and noted its impressions of the veracity and credibility of the witnesses. It noted that it found Bill and the medical providers' testimonies credible and informative and that it found the Pardees', Crystal's, and Stephanie's testimonies problematic and not credible. The court found that on April 21, 2021, "Valerie did not have the mental and emotional capacity to deliberate her actions and knowledgeably and act independently to make an unconfused and uninfluenced decision to execute a will." The court further

found that Valerie was unduly influenced, and the evidence showed a substitution of volition. The court specifically found that the timing and deceptive circumstances of the wills, coming when Valerie was grieving the death of her mother and was having her medications adjusted, was troublesome. The trial court found that both wills were null and any orders probating them and any orders arising therefrom were vacated. The court ordered that Valerie died intestate and Suzanna, as her only child, was her sole intestate heir. The Pardees have appealed this judgment.

## DISCUSSION

The Pardees have asserted three assignments of error, which will be addressed below.

**First Assignment of Error: The court erred in finding that collateral relations who had no standing would inherit nothing had any right to challenge the validity of the Last Will and Testament of Valerie Braswell.**

In their first assignment of error, the Pardees contend that the trial court erred in finding that Julie and Jennifer had standing to challenge the validity of Valerie's second will. They contend that Julie and Jennifer, as collateral relations, have no standing to challenge the second will.

La. C.C.P. art. 681 states that "[e]xcept as otherwise provided by law, an action can be brought only by a person having a real and actual interest which he asserts." While the exception of no right of action tests whether the plaintiff has a "real and actual interest" in the action, it does not raise questions of the plaintiff's ability to prevail on the merits or whether the defendant may have a valid defense. *Succession of Sylvester*, 16-372 (La. App. 5 Cir. 12/14/16), 215 So. 3d 368, *writ denied*, 17-00265 (La. 4/13/17), 218 So. 3d 119. The court assumes the "petition states a valid cause of

action for some person and questions whether the plaintiff in the particular case is a member of the class that has a legal interest in the subject matter of the litigation." *Howard v. Admrs. of Tulane Educ. Fund,* 07-2224 (La. 7/1/08), 986 So. 2d 47. The introduction of evidence is permitted to support or controvert an exception of no right of action. La. C.C.P. art. 931.

The burden of proof establishing the exception of no right of action is on the exceptor. The determination of whether a plaintiff has a right to bring an action raises a question of law, which requires *de novo* review. La. C.C.P. art. 5051 provides that the articles of the Louisiana Code of Civil Procedure "are to be construed liberally, and with due regard for the fact that rules of procedure implement the substantive law and are not an end in themselves."

La. C.C.P. art. 2972, which is included in the chapter providing general rules of procedure for succession proceedings, states that an opposition to a petition, motion, or other application for an order or judgment in a succession proceeding shall allege the interest of the opponent in filing the opposition. Section (b) of the Official Revision Comments to La. C.C.P. art. 2972 further explains that a person must have a "justiciable interest" to file an opposition in a succession proceeding. "The definition of this interest has been left for the determination of the courts, and the requirement has been stated only implicitly in the term 'interested person'." *Id.* Louisiana courts recognize that one must have a justiciable interest in the succession proceeding in order to have standing to maintain an action to annul the testator's testament. *See Succession of Brandt*, 21-131 (La. App. 5 Cir. 12/29/21), 334 So. 3d 1041.

This court addressed a similar issue in *Succession of Kilpatrick*, 356 So. 2d 1083 (La. App. 2 Cir. 1978), wherein it determined that a bank named as the decedent's executor and trustee of a trust established in a 1976 will had a right of action to file a petition to annul a probated will executed by the decedent a year later. The executors for the 1977 will filed an exception of no right of action against the bank, arguing that it did not have a real or actual interest in annulling the 1977 will because it was not an heir or beneficiary under the 1976 will. The bank argued that it had a right of action to annul because it was named as the executor and trustee of the 1976 will.

This Court found that because the bank would have a pecuniary interest as the executor and because it was the universal legatee of the 1976 will, the bank possessed a justiciable interest in the action to annul the later will. Other courts have affirmed that an interested party has a justiciable interest in opposing a succession proceeding if they will be able to benefit from the attack. *Succession of Brandt*, *supra*; *Estate of Mallet v. Mallet*, 527 So. 2d 30 (La. App. 3 Cir. 1988); *Succession of Moran*, 485 So. 2d 623 (La. App. 4 Cir. 1986).

In the present matter, our *de novo* review of the record indicates that Julie and Jennifer had standing to attack the second will, as the heirs and legatees of the first will. While the particular facts of this case are complex and purposefully confusing by the actions of various parties, including the decedent herself, it remains that Julie and Jennifer argued the second will was the product of undue influence. While the trial court ultimately found both wills were tainted by a lack of capacity, the argument still existed at the

12

time the second will was challenged by Julie and Jennifer as the product of undue influence but the first will was not, giving them the opportunity to inherit under the first will. Considering that the articles of civil procedure are to be construed liberally, we find that Julie and Jennifer had standing to challenge the second will, as the heirs of the first will. This assignment of error is without merit.

**Second Assignment of Error: The court erred in finding that the plaintiffs proved by clear and convincing evidence that Valerie Braswell lacked testamentary capacity at the time she executed her Last Will and Testament. The court created a new standard stating the decedent lacked "executive function" making ability, instead of simply determining whether she had mental capacity to understand that she was executing a will and the effects thereof.**

The Pardees contend that the trial court erred in finding there was clear and convincing evidence that Valerie did not have the capacity to execute the second will. They note the lay testimony stating that she knew who and where she was on April 20, 2021, and the fact that her medical providers never diagnosed Valerie with dementia or Alzheimer's.

All persons have capacity to make and receive donations *inter vivos* and mortis causa, except as expressly provided by law. La. C.C. art. 1470. Capacity to donate mortis causa must exist at the time the testator executes the testament. La. C.C. art. 1471. There is a presumption in favor of testamentary capacity. *In re Succession of Furlow*, 44,473 (La. App. 2 Cir. 8/12/09), 17 So. 3d 475. Testamentary capacity means the donor must be able to comprehend generally the nature and consequences of the disposition he is making. La. C.C. art. 1477. A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time he executed the testament. La. C.C. art. 1482. The issue

13

of capacity is factual in nature; the ultimate finding that the testator either possessed or lacked capacity cannot be disturbed unless clearly wrong or manifestly erroneous. *Succession of Furlow*, *supra*. The court may consider medical evidence, other expert testimony, and lay witness testimony. As such, there is no "litmus paper" test to apply in the evaluation of mental capacity. La. C.C. art. 1477, Revision comment (f).

In will contest cases, absent a finding of manifest error, the factual findings of the trial court are accorded great weight and will not be disturbed on appeal. *Succession of Moore*, 54,338 (La. App. 2 Cir. 3/30/22), 339 So. 3d 12, *writ denied*, 22-00973 (La. 10/4/22), 347 So. 3d 859. The factfinder is required to assess the credibility of all witnesses, whether they be lay people or experts, to determine the most credible evidence. Expert testimony is to be weighted the same as any other evidence, and the trier of fact can accept or reject, in whole or in part, any expert opinion. Such credibility determinations are factual issues to be resolved by the trier of fact and should not be disturbed on appeal absent manifest error. *Id.*

The trial court was presented with conflicting testimony regarding Valerie's capacity to execute the wills on April 20, 2021. Our inquiry is whether the result reached by the trial court was manifestly erroneous. Debra testified that the two-will scheme was entirely Valerie's idea and that she knew what she was doing the day she executed the wills. Miramon testified that Valerie seemed capable of executing the wills and she did not think she needed to get a doctor's note on capacity. Bill and Julie testified that they did not think Valerie was capable of creating the two-will scheme but believed her capable of executing the first will. Significantly, both of

14

Valerie's treating medical team testified that she did not have the capacity to execute the wills on April 20, 2021. Dr. Hernandez testified that if Miramon had contacted him about a letter as to Valerie's capacity, he would not have signed such a letter.

The trial court's reasons for judgment are extensive and specifically reference the credibility of each witness and their testimony. The trial court found Perkins and Dr. Hernandez to be credible and noted "the two medical caregivers who actually saw Valerie on the day she executed the disputed testaments both unequivocally stated that she lacked capacity." We cannot say that this determination by the trial court was manifestly erroneous. In the face of conflicting evidence and testimony, the trial court was in the best position to make credibility determinations, and this court will not disturb such determinations on appeal. This assignment of error is without merit.

**<u>Third Assignment of Error:</u> The trial court erred in finding that Debra Pardee asserted undue influence over Valerie Braswell, such that the latter's own intentions were substituted for those of Valerie Braswell.**

Finally, the Pardees contend that the trial court erred in finding that Debra asserted undue influence over Valerie. A donation *inter vivos* or *mortis causa* shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor. "Mere advice, or persuasion, or kindness or assistance, should not constitute influence that would destroy the free agency of the donor and substitute someone else's volition for his own." *In re Succession of Gilbert*, 37,047 (La. App. 2 Cir. 6/5/03), 850 So. 2d 733, *writ denied*, 03-1887 (La. 11/7/03), 857 So. 2d 493. La. C.C. art. 1483 states:

A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence.

"Proof by a preponderance of the evidence means that the evidence, taken as a whole, shows that the fact or cause sought to be proven is more probable than not." *Crowell v. City of Alexandria Through Synder*, 558 So. 2d 216 (La. 1990).

The trial court's finding of, or failure to find, undue influence is fact intensive, and such a finding cannot be disturbed on appeal in the absence of manifest error. *Succession of Gilbert*, *supra*. Reversal is warranted only if the appellate court finds that no reasonable factual basis for the trial court's finding exists in the record and that the finding is clearly wrong. *Id.* When seeking to annul a donation on the basis of undue influence, it is not sufficient to merely show that the donee exercised some degree of influence over a donor; instead, the challenger must show that the donee's influence was so substantial that the donee substituted his or her volition for that of the donor. To annul a testamentary disposition on the basis of undue influence, the influence must be operative at the time the testament is executed. *Id.* When the evidence shows that the execution of a testament was well within the discretion of the testator, the court should find that the testator's volition has not been substituted by the volition of any donee. *Id.*

Because Valerie and Debra had established a relationship of confidence and were not related by affinity, consanguinity, or adoption, only

16

a preponderance of the evidence was required to show undue influence. *In re Succession of Gilbert*, *supra*. Here, the evidence is sufficient to support the trial court's finding of undue influence by Debra over Valerie. As noted above, the trial court made credibility determinations based on witness testimony and found that Debra's testimony that she was unaware and uninvolved in the two-will scheme to be implausible. The trial court determined that the evidence showed that the Pardees, Stephanie, and Crystal took advantage of a critically ill woman after witnessing the conflict within her family after the death of her mother. The court gave great credence to Valerie's medical team's testimony that she did not have the capacity on April 21, 2021, to execute the wills and that her overall mental and physical health made her susceptible to influence from those around her. We do not find this conclusion, based on the evidence presented in the record, to be manifestly erroneous. As such, this assignment of error is likewise without merit.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment. Costs of this appeal are assessed to appellants Kenneth Pardee and Debra Pardee. **AFFIRMED.**

17